IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARVIN C. VIKE, and
CONNIE M. VIKE,

                    Plaintiffs,

      v.

BENJAMIN J. COOPMAN, JOHN
C. BECKER, NEIL PIERCE, and
ROCK COUNTY,

                   Defendants.

OPINION and ORDER

08-cv-486-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this civil action for monetary relief, plaintiffs Marvin C. and Connie M. Vike contend that defendant Rock County violated certain provisions of the Americans with Disabilities Act (ADA) (42 U.S.C. §§ 12112(a) and 12203(a)) and that defendants Benjamin Coopman, John C. Becker and Neil Pierce violated plaintiffs' right to due process and equal protection under the law.  Plaintiffs contend that these violations occurred when defendants laid off Marvin because of his permanent medical restrictions, interfered with his ability to return to his position, withheld retroactive pay owed Marvin and interfered with Connie's right to use certain employee benefits.  The case is before the court on defendants' motion for summary judgment.

I will deny defendants' motion for summary judgment as to two claims:  Marvin's claim that defendant Rock County violated the Americans with Disabilities Act by failing to accommodate his disability and Marvin's claim that defendants Coopman, Becker and Pierce violated his right to due process.  As to the first claim, defendants' only argument in support of summary judgment is that Marvin cannot show he is disabled under the ADA. Because I conclude otherwise, that claim may proceed to trial.  As for Marvin's due process claim, defendants do not explain why summary judgment should be granted as to that claim.

I will grant defendants' motion for summary judgment as to plaintiffs' remaining claims, which include: (1) Marvin's claim that defendant Rock County retaliated against him in violation of the Americans with Disabilities Act; (2) Marvin's claim that defendants Coopman, Becker and Pierce violated his right to equal protection under the law; (3) Connie's claim that defendant Rock County interfered with her ability to use her employee benefits in violation of the Americans with Disabilities Act; and (4) Connie's claim that defendant Becker violated her right to due process and equal protection under the law. Plaintiffs had not adduced sufficient evidence to support Marvin's claim for retaliation or Connie's discrimination, due process and equal protection claims.  Marvin's equal protection claim must be dismissed for Marvin's failure to show that defendants violated "clearly established law."  In addition, I will grant defendants's motion for summary judgment with respect to two additional claims:  that defendant Rock County violated the ADA by

2

discriminating against Marvin because of his association with Connie and that it violated the ADA by failing to accommodate Connie's disability.  Plaintiffs do not oppose defendants' motion as to these claims.  Plts.' Br., dkt. #44, at 15 and 25.

Before turning to the facts, it is necessary to address several procedural matters.  First, in their brief, defendants cite a report prepared by their vocational rehabilitation expert to support their position that Marvin is not disabled.  They propose no facts about the expert report but cite it directly in their brief.  "The court will not consider facts contained only in a brief."  Procedure to be Followed on Motions for Summary Judgment, I.B.4, attached to Pretrial Conference Order, dkt. #14.  In addition, defendants respond to a number of plaintiffs' proposed facts by stating that they "admit that [the declarant] so testified."  Under this court's procedures, defendants were required to do more than this if they hoped to put those facts in dispute.  Procedure, II.D.2 ("If you dispute a proposed fact, state your version of the fact and refer to evidence that supports that version.").  Pursuant to the court's procedural rules, I will disregard those facts contained only in defendants' brief (regardless whether plaintiff discussed these factual statements in their brief in opposition) and treat as undisputed those proposed findings of fact that defendants failed to properly dispute.

Next, defendants object to plaintiffs' use of certain exhibits, such as their use of two documents prepared by the Wisconsin Equal Rights Division in which the division made an "initial determination of probable cause."  To the extent plaintiffs cite those documents to

3

support the merits of Marvin's disability discrimination claim, those facts will be disregarded because they are irrelevant or improper hearsay or both.  However, plaintiffs cite one of the initial determinations as evidence of grounds for retaliation.  For that purpose, the document is admissible.  Defendants also "object" to plaintiffs' use of their vocational expert report, although they do not argue that the report is inadmissible.  Instead, they simply criticize the expert's findings in light of other statements made in the report (statements not proposed as facts).  This "objection" does not bar plaintiffs' use of the expert report to support their proposed findings of fact.

From the parties' proposed findings of fact, I find the following facts to be material and undisputed.

UNDISPUTED FACTS

A.  Parties

Defendant Rock County is a governmental entity organized under Chapter 59 of the Wisconsin Statutes and located in south central Wisconsin.  The remaining defendants are employees of defendant Rock County with supervisory positions:  defendant Benjamin J. Coopman is Director of the Rock County Department of Public Works and Rock County Highway Commissioner, defendant John C. Becker is Director of the Rock County Department of Human Resources and defendant Neil Pierce is Construction Superintendent

4

for the Rock County Highway Department.

Plaintiffs are also employees of defendant Rock County.  Plaintiff Marvin C. Vike

works for the Rock County Department of Public Works, Division of Highways, and Connie

M. Vike works for the Rock County Department of Child Support.

B.  Marvin's Layoff

On April 30, 2001, Marvin was hired as a patrol worker for the Department of Public

Works.  On June 10, 2003, he was given the position of "Heavy Truck Driver/Main Shop."

On August 4, 2004, Marvin sustained a work-related injury to his left wrist when a crank

used to roll a tarp covering his truck bed slipped, striking his left hand and wrist four or five

times.  Marvin sustained a tear to the triangular fibrocartilage complex of his left wrist.  On

August 17, 2004, Marvin signed an "Accident and/or Injury Report" and went to see a

doctor about his injury.  He was off work from August 23, 2004 until September 17, 2004.

On May 11, 2005, Dr. Matthew S. Bliss performed surgery on Marvin's wrist.  When

Marvin returned to work from the surgery on May 24, 2005, he was placed under a work

restriction that prevented him from using his left hand for six weeks.  On July 5, 2005,

Marvin was allowed to use his left hand and perform his regular truck driving assignment but

remained under a work restriction that prevented him from lifting more than ten pounds.

On about September 20, 2005, defendant Becker told Marvin that he needed a

5

doctor's order, saying whether he could drive a truck.  Dr. Bliss provided defendant Rock County numerous "return to work reports," stating that Marvin had a ten pound lifting restriction but could drive a truck.  Marvin received physical and occupational therapy and medical treatment starting shortly after his May 11 surgery and continuing until November 22, 2005.  On December 7 and 8, 2005, Marvin participated in a "Joule Functional Capacity Evaluation" at Dr. Bliss's direction.  The evaluator concluded that

> The client demonstrated the ability to tolerate work activities at the Medium work level.  The Medium work level is characterized by exerting 20-50 pounds of force rarely/occasionally and 10-25 pounds of force frequently, and/or no greater than 10 pounds of force constantly.

In an independent evaluation ordered by defendant Rock County's worker compensation administrator, a Dr. Ansari determined that plaintiff was "capable of doing driving work" but "should avoid repetitive twisting [or] lifting greater than 25 pounds" permanently.  After the evaluation, Dr. Bliss declared that Marvin could return to work, but recommended certain permanent work restrictions.  He recommended that plaintiff not lift more than ten pounds, not climb straight ladders, limit the use of vibratory tools and use an automatic tarp.

In June 2006, defendant Coopman decided to lay Marvin off.  He consulted with staff from the Human Resources department, who told him "It's your call."  (Plaintiffs contend that defendant Becker was involved in making the layoff decision, but the only evidence they cite to support this contention are page 58 of Becker's November 2, 2007 deposition, which

6

is not in the record, and a statement from defendant Pierce that the layoff was all defendant

Becker's plan, which is inadmissible as lacking foundation.)

On July 5, 2006, defendants Coopman and Pierce met with Marvin fifteen minutes

before the day's work was completed.  Defendant Coopman told Marvin that he was going

to be laid off because defendant Rock County could not accommodate his permanent

restrictions.  Defendant Coopman told Marvin that he did not think Marvin could shovel

materials or perform certain maintenance on his truck.  Defendant Coopman told Marvin

that he had two-year "recall rights" and should sign up for unemployment.  ("Recall rights"

appear to be a right to return to a position from which an employee was laid off once

circumstances change.)

Under section 6.01 of the collective bargaining agreement for Marvin's union, Marvin

was entitled to two weeks' notice before layoff.  Marvin was given no notice that he was to

be laid off.  On July 14, 2006, Marvin received a letter from defendant Becker, which stated:

> This will confirm that your layoff was effective at the end of your
> normal shift on July 5, 2006.  This action is being taken due to our inability
> to accommodate your permanent restrictions.

> Your recall rights will be in accordance with Section 6.02 of the labor
> agreement.  (Recall rights will be exhausted July 5, 2008)

> You are permitted to return to a Heavy Truck Driver position, or any
> other position that you may be qualified for, if there is a change in your
> restrictions that would allow you to perform the essential functions of the job
> with or without restrictions.

7

Before Marvin was laid off on July 5, 2006, he was able to and did perform all the duties of his job as a truck driver with reasonable accommodation.  He drove a truck; plowed snow; salted; hauled sand, chips, blacktop and gravel; picked up garbage; patched roads; shoveled gravel; worked on crack-filling crews; cleaned culverts; flagged and ran the fuel truck; cleaned the shop; helped install and remove plows, wings and sanders on trucks; and attended training in the use of chainsaws, CPR and first aid.

Marvin had no trouble staying within his restrictions when performing the primary function of his job, which was to drive heavy trucks.  On occasion, Marvin was required to perform job duties that involved heavy lifting or were otherwise outside his restrictions, in which case Marvin would work with another employee to complete the task or perform a different job within his restrictions, such as "flagging,"

Before Marvin's layoff, defendant Pierce, the construction superintendent, and Harold Mayer, the patrol superintendent, were satisfied with Marvin's job performance. (Defendant Pierce supervised plaintiff during the summer months and Mayer supervised him during the winter months.)  Neither defendant Pierce nor Mayer suggested that he could not accommodate Marvin's permanent restrictions.  Defendant Pierce was able to accommodate Marvin's restrictions during the summer months and no accommodations were necessary during the winter months.

At the time that Marvin was laid off, neither Becker nor Coopman talked to Marvin

8

about accommodating Marvin's disability before he was laid off, although both understood that employees with disabilities receive reasonable accommodations.  Becker was responsible for determining whether workplace accommodations were reasonable.  He did not engage in an interactive process with Marvin to determine whether there existed a way to reasonably accommodate Marvin so that he could perform the essential functions of his job.

### C.  Marvin's Ability to Work

Historically, Marvin has worked as a construction laborer and heavy equipment operator, and more recently, as a heavy truck driver for the County.  He graduated from high school in 1967 and has no other formal education or training.  Marvin has never performed a sedentary type of job.

Although Marvin is qualified and licensed to drive a heavy truck, he is not allowed to drive trucks on long hauls or obtain a passenger endorsement on his commercial drivers license because he has diabetes and a lazy eye.  Marvin's left wrist injury has left him unable to perform certain types of work.  In general, the injury prevents Marvin from performing light, medium, heavy and very heavy work.  Although Marvin's functional capacity evaluation showed that he could tolerate some activity within the medium category of work, Marvin would be a poor candidate for work at the medium level of employment because he has a limited range of motion, weakness and inability to perform certain physical and

9

functional tasks.  Indeed, Marvin has lost access to entire classes of jobs involving significant material handling or tool usage.  (His wrist injury prevents him from lifting much weight very often, climbing straight ladders or using vibratory equipment on a regular basis.)

In the Janesville area where Marvin is located, there were approximately 68,080 positions in the labor market as of 2006.  With Marvin's education and skill level, the most likely occupations available to Marvin would involve building and maintenance (1,810 in 2006); installation, maintenance and repair occupations (3,230 in 2006); production work occupations (10,560 in 2006); and transportation and material moving occupations (6,860 in 2006).  (The numbers for 2007 are comparable, if slightly reduced.)  Nearly all of these positions are unavailable to Marvin under Dr. Bliss's permanent restrictions, leaving, at best, 5% of jobs in the Janesville area.  (As defendants point out, the calculus shifts if Dr. Bliss's restrictions are not considered and instead the recommendation of Dr. Ansari sets the limitation of his ability to perform physical labor.  In that case, Marvin may have access to as many as 49.4% of the jobs in the area, without regard to the skill level of those jobs.)

Marvin's truck driver position involved only occasional tool use, material handling and other activities involving the use of the upper left extremity.  Generally, Marvin was able to avoid activities prohibited by his work restrictions and receive accommodation

10

D. <u>Marvin's Return to Work</u>

Shortly after Marvin was laid off, he met with defendant Becker and union representative Mike Wilson to discuss his layoff.  Defendant Becker told Marvin that "maybe he could come up with some kind of temporary assignment" until Marvin's disagreement with his layoff "got straightened out."  Defendant Becker prepared a "draft agreement" that provided that Marvin could return to work performing light duty work pending the County's evaluation of his ability to perform his former work in the Heavy Truck Driver position.  However, the draft agreement provided that Marvin would "waive" his right to seek back pay for the time elapsed since he had been laid off if the County determined that Marvin could not "perform the essential functions of his job, with or without reasonable accommodations."  Marvin refused to sign the agreement.

On July 24, 2006, Marvin filed a charge of discrimination with the Wisconsin Equal Rights Division, alleging that defendant Rock County had failed to reasonably accommodate his disability and that it had laid him off because of his disability.  At some point, defendant Becker was made aware of Marvin's complaint and read it.  On July 25, 2006, the union filed a grievance on Marvin's behalf, alleging that defendant Rock County denied Marvin certain rights he should have received under the labor agreement.

On September 25, 2006, defendant Rock County posted Marvin's position of Heavy Truck Driver.  Marvin submitted a written application for the posting but the position was

11

awarded to David Houfe, who had more seniority than Marvin.  It was standard practice for the County to post jobs before offering them to laid-off employees (pursuant to an arbitration decision from 1983 that involved a separate union).  However, under the union contract and according to the terms of Marvin's layoff letter, Marvin had a right to recall his position for two years.  Moreover, in the past, the Rock County Highway Department had held onto the positions of employees having medical problems until their two-year recall rights had expired or the employee had resigned.  (The record is unclear whether this past practice involved employees who were laid off or was limited to employees on medical leave.)

Marvin objected to the posting of the job, contending that it was the County's past practice to hold open jobs when an employee was laid off for medical reasons.  On October 1, 2006, the union filed a second grievance, alleging that the County violated the labor agreement when Marvin was not offered re-employment.  This grievance has not been pursued by the union.

On January 24, 2007, the arbitration hearing regarding Marvin's July 25, 2006 grievance took place.  (Defendants' undisputed proposed findings of fact states that the January 24, 2007 hearing involved the October 1, 2006 grievance, dkt. #32 at ¶ 109, but the arbitration award defendants cite involves the July 25, 2006 grievance, dkt. #36-13 at 53.)  In a decision dated May 7, 2007, an arbitrator found that defendant Rock County had violated the union contract by laying off Marvin because of his "handicapping condition"

12

and ordered Rock County to reinstate Marvin immediately and make him whole for all his lost wages and benefits.  Defendant Becker was responsible for implementing the award.

After defendant Becker received the arbitrator's decision, he arranged a meeting with the union to discuss how Marvin would be reinstated.  The question was not which position Marvin would receive, but what to do with Houfe, who had taken Marvin's position and had more seniority than Marvin. Defendant Becker offered the following three alternatives:  (1) Houfe could be moved to an open position in the parks division; (2) Houfe could be given an opportunity to choose a position from a "straight bump list" (a list of all qualifying positions held by people less senior to him), which would include Marvin's position; or (3) Houfe could be given a bump list that excluded Marvin's position from the list.  The union representative told defendant Becker that they preferred the "straight bump list" and defendant Becker applied that approach.  Marvin was reinstated to his position as a heavy truck driver, but Houfe bumped Marvin out of the position immediately.

Defendant Becker directed Lori Pope, the lead personnel analyst for the County, to send a letter to Marvin, explaining that he had been bumped and describing his options.  In a letter dated May 8, 2007, Pope wrote Marvin, telling him that he had been bumped from the heavy truck driver position by Houfe and giving Marvin a bump list that provided that Marvin would be laid off if he declined to take any position on the list.  Marvin elected to bump into a patrol worker position.

13

On May 16, 2007, the Wisconsin Equal Rights Division issued an initial determination, finding probable cause that Rock County denied Marvin reasonable accommodation and terminated his employment because of his disability. Defendant Becker found out about the initial determination on or around the time it was issued. On May 22, 2007, the union filed a third grievance. By stipulation, the parties agreed to reinstate Marvin in the heavy truck driver position and return Houfe to his previous position as a patrolman. The union dropped the grievance.

The County paid Marvin back pay, interest and overtime for the time period between July 6, 2006 to May 7, 2007. As a separate matter, the County owed Marvin and his union co-workers retroactive pay from contract negotiations that had resulted in a pay raise. On June 14, 2007, defendant Becker withheld the retroactive wage increase owed Marvin (about $5,800) from Marvin's back pay and denied Marvin overtime pay for the period he was assigned to the Economic Support Agency. Defendant Becker told Marvin that the money withheld would be used to pay down a $9,207 debt Marvin owed to unemployment compensation for benefits improperly awarded to him.

Marvin filed a labor standards complaint challenging the withholding of the funds. On June 30, 2007, a labor standards investigator told the County that there was no law giving the County the right to deduct unemployment compensation from a retroactive pay award and that the County should reimburse Marvin or face litigation from the Labor

14

Standards Bureau.  The County remitted the retroactive pay to Marvin and the Labor Standards Bureau closed the case.


### E. Connie's Leave of Absence

Connie Vike has a history of heart disease.  She had rheumatic fever twice, has had a heart murmur all her life, and after an unrelated surgery, had an episode of heart failure. In February 2006, Connie saw Dr. Kurtz , a cardiologist, regarding the possibility of having heart surgery.  Dr. Kurtz recommended the surgery.  Connie underwent mitral valve repair surgery on March 11, 2006, but did not fully recover from the operation.  Twice she was re-hospitalized with fever, chills and shortness of breath.

Following the surgery, Connie was unable to walk up half a flight of stairs.  Despite treatment, Connie continued to suffer symptoms.  She remained extremely tired and weak and short of breath.  She could not speak a complete sentence without stopping to catch her breath.

Before her heart surgery, Connie obtained approval for leave under the Family Medical Leave Act for the period from March 10, 2006 to May 5, 2006.  After the surgery, Connie asked for two extensions of her leave because of ongoing problems.  On April 28, 2006, defendant Becker approved the first request, which was for a 28-day extension.  The request indicated that Connie was "having complications of pneumonia and chest fluids from

15

open heart surgery" and was not able to perform work of any kind.

On June 20, 2006, defendant Becker approved the second request, which was to begin on July 5, 2006 and continue for a period of three months not to exceed 480 hours. The request stated that Connie was having continued health problems after heart surgery and that there were post-operative "valve repair complications with persistent pulmonary hypertension, recurrent effusions and infections" preventing Connie from performing work of any kind. On the leave request form, Dr. Kurtz did not recommend a specific duration of leave, stating that the time required for Connie's recovery was "unknown at this time." Dkt. #63-4, at 4. Connie's FMLA leave was slated to run out on July 5, 2006, so her leave time starting July 5 was to be provided under the labor agreement. Unlike FMLA leave, this "contractual" leave did not come with continuing health insurance coverage. (Connie carried Rock County's health care plan, which the County itself funded.)

F. Connie's Attempt to Transfer Insurance Coverage to Marvin

When Connie's FMLA leave was slated to run out, she was the primary carrier for the family health insurance. On June 19, 2006, Connie and Marvin met with Amy Spoden from the Rock County Human Resources Department to discuss their health insurance. Connie told Spoden that her doctor had advised her not to return to work until October 2006 but her health insurance coverage was going to end on July 5, 2006 when her FMLA leave ran

16

out.  Rock County's health care plan included a spousal transfer provision that allowed employees to transfer health insurance to a spouse who is also an employee of Rock County. Employees have been allowed to transfer insurance to a spouse when a spouse goes into the military or takes maternity leave.  Connie asked Spoden if she could transfer her health insurance to her husband before taking the second extension on her leave and Spoden said it would be "no problem."  Spoden gave Connie an enrollment form that Connie could fill out and return.

On June 28 and June 30, 2006, Connie went to the Human Resources Department with questions about the form.  On June 28, no one was available to answer them and on June 30, after 35 minutes of relaying her questions to defendant Becker through the secretary, she was told to return on July 5, 2006.

On July 5, 2006, Connie met with defendant Becker and Spoden at 2:00 p.m. to finish asking her questions about the form.  Defendant Becker told Connie that he did not think they would have to go over the questions because there was a chance that Marvin was going to be laid off, which meant that if Connie transferred her insurance to him, she would lose her coverage.  Defendant Becker told Connie that she could use employee-donated time, new vacation time and sick leave to extend her leave and maintain insurance coverage for the time being.  Connie said that she did not think that would cover the three months of leave she was requesting.  Defendant Becker responded, "Well, then you'll just have to come back

17

to work."

If Connie had stayed off work and used all her time, it would have been used up by September 13, 2006, two weeks short of the contract leave she had requested, and she would have been left with no reserve leave time for the additional treatment she thought she would need. Moreover, under a special provision of her insurance plain, her coverage would remain in effect "for no longer than six months during a period of total disability," and she had been on leave since March 11, 2006. (It is not clear whether her leave would be considered a period of "total disability" under the plan; if so, she would have to return by September 11, 2006 to avoid losing coverage.)

Connie decided not to transfer her health insurance. To retain her insurance and her reserve leave time, she returned to work on August 1, 2006. On July 25, 2006, Connie saw Dr. Kantamneni, the surgeon who had performed her surgery. He signed a slip releasing Connie to work starting August 1, 2006. He authorized the release from the standpoint of her recovery from surgery, making no recommendation regarding Connie's heart condition overall. As of August 1, 2006, Connie was still experiencing the same symptoms that had led her to request an extended medical leave initially. She continued to experience shortness of breath, was unable to tolerate any aerobic activity and could not speak in full sentences without stopping to catch her breath. Although Connie continued to suffer the same symptoms, she did not want the doctor to place restrictions on her return to work. She was

18

afraid that she might be laid off as her husband had been.

Connie has had additional treatment since her leave, including a second heart surgery. Her symptoms have improved somewhat, but she will likely continue to experience heart complications or problems for the rest of her life.


OPINION

A.  ADA Claims

The parties agree that plaintiffs' ADA claims are governed by the standards set forth before the recent passage of the Americans with Disabilities Amendments Act of 2008, which came into law after the incidents at issue in this case occurred.  Landgraf v. USI Film Products, 511 U.S. 244, 280 (1994) (absent clear congressional intent, statute enacted after events in suit does not govern if the statute would have prejudicial "retroactive effect").


1.  Marvin's accommodation claim

A claim of failure to accommodate a disability includes three elements:  "(1) [the plaintiff] is a qualified individual with a disability; (2) the employer was aware of [the plaintiff's] disability; and (3) the employer failed to reasonably accommodate the disability." Mobley v. Allstate Insurance Co., 531 F.3d 539, 545 (7th Cir. 2008) (internal quotations omitted); 42 U.S.C. §§ 12112(a), 12112(b)(5)(A).  Defendants' sole argument in support

19

of summary judgment with respect to Marvin's failure to accommodate claim is that he is not "disabled." Defs. Br., dkt. #29, at 20-26.

Among the ways a plaintiff can show that he is "disabled" under the ADA is to establish that he has a physical or mental impairment that "substantially limits" at least one of his "major life activities." 42 U.S.C. § 12102(1)(A). Marvin contends that his wrist injury substantially limits his ability to work. (Although he originally argued that it also substantially limited his ability to sleep, he has abandoned that position by declining to respond to defendants' arguments opposing the position.)

Work is a "major life activity," id., § 12102(2)(A). To show that he is "substantially limited" in his ability to work, Marvin must show that he is "significantly restricted in [his] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." Squibb v. Memorial Medical Center, 497 F.3d 775, 782 (7th Cir. 2007) (quoting 29 C.F.R. § 1630.2(j)(3)(i)). Thus, to prove his case, Marvin may show either that his wrist injury significantly restricted his ability to work in all jobs utilizing "training, knowledge, and skills" similar to the heavy truck driver position that are within "the geographical area to which the [plaintiff] has reasonable access,'" E.E.O.C. v. Rockwell International Corp., 243 F.3d 1012, 1017 (7th Cir. 2001) (citing 29 C.F.R. § 1630.2(j)(3)(ii)(A)-(B)), or his ability to work in all other jobs within 'the geographical area to which the [plaintiff] has reasonable access.'"

20

Rockwell, 243 F.3d at 1017 (citing 29 C.F.R. § 1630.2(j)(3)(ii)(A), (C)).

Defendants contend that Marvin's impairment is essentially a lifting restriction, which they argue does not constitute a disability.  Several cases suggest that lifting restrictions such as Marvin's are not enough to receive protection under the ADA.  Squibb, 497 F.3d at 781 (expressing "doubt that an inability to lift more than ten pounds . . . could constitute a disability within the meaning of the statute."); Contreras v. Suncast Corp., 237 F.3d 756, 763 (7th Cir. 2001) (45-pound lifting limitation does not qualify as substantial limitation on working); see also Williams v. Channel Master Satellite Systems, Inc., 101 F.3d 346, 349 (4th Cir. 1996) ("twenty-five pound lifting limitation—particularly when compared to an average person's abilities—does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity"); Aucutt v. Six Flags Over Mid-America, 85 F.3d 1311, 1319 (8th Cir. 1996) (25-pound lifting restriction alone insufficient to show substantial limitation); Ray v. Glidden Co., 85 F.3d 227, 228-29 (5th Cir. 1996) (inability to continuously lift 44-56-pound containers not substantial limitation on ability to work); Wooten v. Farmland Foods, 58 F.3d 382, 384, 386 (8th Cir.1995) (restriction to light duty, no cold environment and 20-pound lifting restriction not substantial limitation in ability to work); Mays v. Principi, 301 F.3d 866, 869-70 (7th Cir. 2002) (stating in dicta that "[t]he number of Americans restricted by back problems to light work is legion.  They are not disabled.").

21

Although these cases suggest that a lifting restriction alone could never suffice to establish a disability, "whether a person has a disability under the ADA is an individualized inquiry." <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 483 (1999) (citing <u>Bragdon v. Abbott</u>, 524 U.S. 624, 641-642 (1998)).  Generally, even in cases in which courts have found that a lifting restriction fails to establish disability, they do not apply a default rule, instead finding no disability because the record failed to establish that the plaintiff could not perform a class of jobs or a broad range of jobs.  <u>Squibb</u>, 497 F.3d at 783; <u>see also</u> <u>Contreras</u>, 237 F.3d at 763 (although plaintiff had 45-pound lifting restriction and was unable to engage in strenuous work or drive forklift for more than four hours each day, no disability because plaintiff did not "present[] evidence that even hints at the notion that he is precluded from a broad class of jobs"); <u>Aucutt</u>, 85 F.3d at 1319 (no evidence that heart and circulation problems placed significant restriction on plaintiff's ability to perform any major life activity; evidence that plaintiff could not perform obstacle course and had 25-pound lifting restriction insufficient to show restriction to "overall employment opportunities"); <u>Ray</u>, 85 F.3d at 228-29 (relying on <u>Dutcher v. Ingalls Shipbuilding</u>, 53 F.3d 723, 727 (5th Cir. 1995), which found no disability because plaintiff presented no evidence that her lifting restriction prevented her from performing entire class of jobs); <u>Wooten</u>, 58 F.3d at 386 ("Wooten's impairments . . . only appeared to prevent him from performing a narrow range of meatpacking jobs"); <u>but see</u> <u>Williams</u>, 101 F.3d at 349 (holding "as a matter of law" that

22

25-pound lifting limitation not a significant restriction on ability to work or perform other major life activity).

Moreover, in cases in which there *is* evidence that a plaintiff's lifting restriction prevents him from performing a class of jobs or a broad range of jobs, the Court of Appeals for the Seventh Circuit has held that a jury could find disability.  DePaoli v. Abbott Laboratories, 140 F.3d 668, 673 (7th Cir. 1998) (plaintiff's hand injury prevented her from performing virtually any employment that required repetitive motions of hand, indicating that plaintiff was precluded from wide group of jobs in Chicago area); Cochrum v. Old Ben Coal Co., 102 F.3d 908, 911 (7th Cir. 1996) (plaintiff's restriction preventing him from performing overhead work, heavy lifting or pulling and pushing out from his body "are more than job specific"; from breadth of physical restrictions alone jury could conclude that plaintiff is disabled); see also Best v. Shell Oil, 107 F.3d 544, 548 (7th Cir. 1997) (evidence that plaintiff's knee injury substantially limited his ability to work in any truck driver position sufficient to allow jury to find plaintiff was disabled).

Thus, the question whether a lifting limitation such as Marvin's can be considered a disability boils down to the question whether the limitation significantly restricts plaintiff's ability to perform either a class of jobs or a broad range of jobs geographically accessible to him.  In this case, plaintiffs have provided evidence of Marvin's ability to perform jobs in the geographical market in light of his wrist injury and medical restriction.  According to

23

Marvin's vocational expert, Marvin has lost access to nearly all jobs within the class of jobs similar to the heavy truck driver position and overall has access to only about 5% of jobs in the Janesville area.

Defendants contend that Marvin's expert's opinion regarding Marvin's access to jobs is flawed because the expert relied on Dr. Bliss's medical restrictions to narrow the number of jobs available to Marvin by treating Marvin as limited to "sedentary" work. As defendants point out, the expert relies in part on a functional capacity evaluation, which found that Marvin could perform work at the "medium" level.

Defendants may be correct that Marvin's expert's opinion relies on a faulty methodology, but that is not a matter that they can establish by simply arguing it in their brief. Marvin's expert explains that he applies Dr. Bliss's restrictions as the baseline for available jobs because, although the functional capacity evaluation showed that Marvin could perform some medium work, plaintiff "is a poor candidate for the full range of medium level employment." Whether he is right is a matter for a jury, not a question that can be decided as a matter of law.

In light of Marvin's expert's opinion regarding his ability to work at jobs in the Janesville area under his permanent medical restriction, a reasonable jury could find that Marvin is significantly restricted from a class of jobs or a broad range of jobs and therefore disabled. Because this is the only issue defendants have raised in relation to Marvin's failure

24

to accommodate claim, their motion for summary judgment will be denied as to that claim.

2.  Marvin's retaliation claims

Under the ADA, "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]."  42 U.S.C. § 12203(a).  Plaintiffs contend that defendants took three adverse actions against Marvin in retaliation for his filing a charge of disability discrimination with the Wisconsin Equal Rights Division on July 24, 2006: (1) On September 25, 2006, Marvin's former job was posted and given to Houfe; (2) on May 8, 2007, Marvin was "bumped" out of his position when he was reinstated; (3) on June 14, 2007, the County withheld retroactive pay it owed Marvin.

To establish that any of these actions violated § 12203(a), Marvin was required to show, among other things, "a causal link between the protected expression and the adverse action."  Silk v. City of Chicago, 194 F.3d 788, 799 (7th Cir. 1999) (quoting Talanda v. KFC National Management Co., 140 F.3d 1090, 1095-96 (7th Cir. 1998)).  (Alternatively, a plaintiff may establish evidence of retaliation "indirectly" under McDonnel Douglas Corp. v. Green, 411 U.S. 792 (1973) by showing he was treated differently than similarly situated employees who did not engage in protected activity, in which case no causal link is required,

25

Stone v. City of Indianapolis Public Utilities Division, 281 F.3d 640, 644 (7th Cir. 2002), but Marvin does not attempt to prove retaliation indirectly.)   Marvin contends that a reasonable jury could infer that the adverse actions were taken in retaliation for his filing the July 24, 2006 disability discrimination charge because there is "close temporal proximity" between (1) the filing of the charge and defendants' September 25, 2006 posting of Marvin's job; (2) the May 7, 2007 arbitration award requiring plaintiff's reinstatement "due to his handicapping position" and the May 8, 2007 "bumping"; and (3) the May 16, 2007 Equal Rights Division probable cause determination on Marvin's disability discrimination claim and the June 14, 2007 withholding of Marvin's retroactive pay.

Plaintiffs are correct that a "close temporal proximity" between a protected activity and an adverse action may allow a reasonable jury to infer a retaliatory motive, Lang v. Illinois Department of Children and Family Services, 361 F.3d 416, 419 (7th Cir. 2004), just as an adverse action taken shortly after favorable rulings occur may help build a case for retaliation, Sitar v. Indiana Department of Transportation, 344 F.3d 720, 728-29 (7th Cir. 2003).  However, evidence of temporal proximity alone is usually insufficient to establish the required causal connection.  Mobley, 531 F.3d at 549; see also Stone, 281 F.3d at 644 (collecting cases).

On occasion, an adverse action occurs "on the heels" of a protected activity, in which case the timing of the action alone may give rise to an inference of retaliatory motive.

26

McClendon v. Indiana Sugars, 108 F.3d 789, 796 (7th Cir. 1997) (citations omitted). Plaintiffs contend that defendants' first adverse action, which occurred two months after Marvin's filing his disability discrimination charge, occurred "on the heels of the protected activity, citing Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1458 (7th Cir. 1994) in support of that position.

However, Dey cannot be read to stand for the conclusion that adverse actions taken four weeks after a protected activity automatically give rise to an inference of retaliation. Compare Dey, 28 F.3d at 1458 (four-week delay allows inference of retaliation) with Contreras, 237 F.3d at 765 (one-month delay too long to allow inference of retaliation) and Pugh v. City of Attica, 259 F.3d 619, 629-30 (7th Cir. 2001) (one-week delay too long to allow inference of retaliation).  The four-week delay in Dey was not the only evidence that supported an inference of retaliation:  the excuse the defendant provided for the adverse action was "poor performance" although plaintiff had recently received "an unusually large raise" without mention of any performance problems.  Dey, 28 F.3d at 1458.

Even if Dey could be read to support an automatic inference of retaliation whenever an adverse actions occurs within four weeks, four weeks must be the outer limits for finding retaliatory motive on timing alone.  Mobley, 531 F.3d at 549 (adverse action can be said to have occurred "on the heels" of protected activity if it occurs within days, or at most, weeks of protected activity).  Because the first adverse action plaintiffs identify did not occur until

27

two months after Marvin filed his disability discrimination charge, even <u>Dey</u> would not support the drawing of an inference of retaliatory motive in this case.

The other two adverse actions fare no better.  Plaintiffs' theory is that these later adverse actions can be tied back to his pending disability discrimination charge because incidents related to the discrimination charge occurred shortly before each of those actions. Plaintiffs point out that in <u>Sitar</u>, 344 F.3d at 728-29, the court of appeals found insufficient evidence of retaliation when an adverse action was taken in response to rulings related to a protected activity.  However, in <u>Sitar</u>, the plaintiff produced evidence that the adverse actor was "visibly upset" upon receiving findings and recommendations against him and decided almost immediately to terminate the plaintiff.

In this case, plaintiffs point to nothing suspicious about the timing or circumstances of the adverse actions that would tie them back to Marvin's disability discrimination charge. Although the May 8 "bump" occurred only one day after Marvin received an arbitration award reinstating him, he could not have been "bumped" before he was reinstated and it only makes sense that his bump would occur immediately after reinstatement when his position had already been taken by someone with more seniority.

As for the the County's withholding of retroactive benefits, that did not occur until one month after the Equal Rights Division had made its probable cause determination. Plaintiffs have produced no evidence to suggest that the withholding was somehow in

28

response to the probable cause determination.  In short, no reasonable jury could find a causal link between the adverse actions Marvin identifies and the allegedly protected expressions.  Therefore, I will grant defendants' motion as to Marvin's retaliation claim.

3.  Marvin's equal protection and due process claims

Unless plaintiffs can show that defendants discriminated against Marvin because of his disability "in an irrational manner or for an illegitimate reason," Marvin cannot prevail on his equal protection claim.  Stevens v. Illinois Department of Transportation, 210 F.3d 732, 738 (7th Cir. 2000).  However, defendants did not press plaintiffs to prove the elements of Marvin's equal protection claim, arguing only that Marvin's claim fails because Marvin cannot establish a prima facie case of disability discrimination under the ADA.  As I explained above, Marvin *can* establish a prima facie case of disability discrimination.  More important, whether defendants violated the equal protection clause has little to do with whether they have violated the ADA.  The ADA requires accommodation to individuals with disabilities; the equal protection clause requires rational governmental action.  These two things may be at odds.

Because defendants did not contend that plaintiffs could not prove the elements of Marvin's equal protection claim, plaintiffs were not required to come forth with evidence sufficient to show that defendants acted "in an irrational manner or for an illegitimate

29

reason." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986) (party seeking summary judgment always bears initial responsibility of informing district court of basis for summary judgment).

Although defendants have not carried their initial burden with regard to challenging the merits of Marvin's equal protection claim in their motion for summary judgment, they argue that they are entitled to qualified immunity because it was not "clearly established" that defendants' actions violated the equal protection clause. Qualified immunity applies whenever a government official's actions, even if unconstitutional, did not violate the "clearly established law" at the time. E.g., Pearson v. Callahan, 129 S. Ct. 808, 822 (2009). Once the defendant has raised a qualified immunity defense, the plaintiff has the burden to show that it should not apply. Mannoia v. Farrow, 476 F.3d 453, 457 (7th Cir. 2007) (citations omitted).

A qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001). Although a plaintiff is not required to point to a case directly on point to carry their burden, Hope v. Pelzer, 536 U.S. 730, 741 (2002); Nabozny v. Podlesny, 92 F.3d 446, 456 (7th Cir. 1996), he does need to explain how the state of the law at the time of defendants' actions "gave [defendants] fair warning" that their actions were unconstitutional. Hope, 536 U.S. at 741.

Plaintiffs cite two cases that stand for the general proposition that disabled

30

individuals are entitled to equal protection under the law (under the rational basis standard) and contend that the facts are sufficient to establish that defendants laid Marvin off because of his disability.  Plts.' Br., dkt. #44, at 29.  Plaintiffs' showing is inadequate.  The cases cited do not explain why defendants had fair warning that laying off Marvin because of his disability would likely violate his right to equal protection under the law.  Moreover, my own research suggests that defendants had every reason to believe they could consider his disability when laying him off without violating his equal protection rights.  Erickson v. Board of Governors, 207 F.3d 945, 949 (7th Cir. 2000) ("Consideration of an employee's disabilities is proper, so far as the Constitution is concerned.").  Therefore, I will grant defendants' motion for summary judgment as to Marvin's equal protection claim against defendants Pierce, Becker and Coopman.

This leaves Marvin's due process claim.  Although defendants moved for summary judgment as to all of plaintiffs' claims, they did not mention Marvin's due process claim at all.  In other words, as to this claim, defendants did not carry their initial burden of "informing the district court of the basis" for summary judgment.  Celotex, 477 U.S. at 323-24.  Therefore, to the extent defendants moved for summary judgment on Marvin's due process claim, that motion will be denied.

4.  Connie's disparate treatment claim

Connie contends that defendant Rock County violated the ADA by preventing her from transferring her insurance to her husband or from taking full advantage of the leave of absence she had been seeking because of her serious heart problems.  As plaintiffs point out, the ADA prohibits discrimination on the basis of disability with regard to the "terms, conditions and privileges of employment," 42 U.S.C. § 12112(a), which includes leaves of absence and "fringe benefits available by virtue of employment" such as Rock County's spousal transfer provision allowing spouses to transfer insurance coverage.  29 C.F.R. § 1630.4(e)(f).  Thus, Connie could prevail on an ADA claim by showing that defendant Rock County interfered with her ability to use the County's spousal transfer provision or contractual leave of absence because of her disability.

Although Connie argues that defendant Rock County stood in her way of transferring her insurance or taking contractual leave, she fails to show that this interference was because of her disability.  Her evidence of discrimination boils down to (1) the "suspicious" timing of Marvin's layoff, which was the same day she was scheduled to transfer her insurance and take contractual leave; (2) evidence that defendants discriminated against Marvin because of his disability; (3) the fact that the spousal transfer provision can by used when a spouse goes into the military or on maternity leave; and (4) the apparently pretextual explanation for Marvin's layoff.  None of this evidence could lead a reasonable jury to find that defendant

32

Rock County discriminated against Connie because of her disability. The evidence suggests that Connie's ability to use these benefits was simply collateral to the alleged discrimination of Marvin.

Connie suggests that defendants may have been attempting to reduce costs (the county funds its own health insurance), perhaps timing their decision to lay off Marvin in the hopes that Connie would lose her insurance coverage to remain on her much-needed leave of absence. Perhaps there is something to Connie's theory: the timing of defendants' lay-off is curious. (At the same time, one wonders why, if this was the motive, would Becker have warned Connie of the risk she would be taking if she made her transfer?) Even such a cold and calculated move on defendants' part would not give rise to an ADA claim, however. Cf. Dewitt v. Proctor Hospital, 517 F.3d 944, 953 (7th Cir. 2008) (Posner, J., concurring) (If cost of medical care is only motive for discrimination, there is no disability discrimination). At the end, the record contains nothing to suggest that defendants acted against Connie because of her disability, which is what Connie had to show if she were to survive summary judgment on this claim. Because plaintiffs have failed to adduce sufficient evidence to allow a reasonable jury to find that defendant Rock County interfered with her employee benefits because of her disability, I will grant defendants' motion for summary judgment as to this claim.

Because plaintiffs have failed to adduce sufficient evidence to allow a reasonable jury

33

to find that defendant Rock County interfered with her employee benefits because of her disability, I will grant defendants' motion for summary judgment as to this claim.

5.  Connie's equal protection and due process claims

Connie contends that defendant Becker violated her right to due process and equal protection under the law when he interfered with her employee benefits because of her disability.  Defendants contend that "[n]othing in this record indicates that Connie experienced a constitutional deprivation based on her disability."  Defs.' Br., dkt. #29, at 38-39.  This put plaintiffs on notice, if only barely, that they would have to point to evidence in the record to support Connie's equal protection and due process claims.  Celotex, 477 U.S. at 323-24.  Plaintiffs' response is that the record supports a finding that defendant Becker prevented Connie from using her benefits "because of her disability."  As I have explained, the record falls short of allowing a reasonable jury to find that Connie was mistreated "because of her disability."  More to the point, nothing in the record would allow a reasonable jury to find that (1) defendant Becker treated Connie irrationally in violation of the equal protection clause or (2) Connie was owed process under the constitution and was not afforded the process owed.  Therefore, I will grant defendants' motion as to Connie's equal protection and due process claims.

34

ORDER

IT IS ORDERED that

1.  The motion for summary judgment filed by defendants Rock County, Benjamin

J. Coopman, John C. Becker and Neil Pierce, dkt. #28, is GRANTED with respect to:

        a.  Marvin C. Vike's claim that defendant Rock County violated the Americans

with Disabilities Act by discriminating against him because of his association with

Connie M. Vike;

        b.  Marvin C. Vike's claim that defendant Rock County retaliated against him

for filing a disability discrimination charge by (i) posting Marvin's job and giving it

to another person; (ii) "bumping" Marvin out of his position once he was reinstated;

and (iii) withholding retroactive pay it owed Marvin;

        c.  Marvin C. Vike's claim that defendants Coopman, Becker and Pierce

violated his right to equal protection under the law;

        d.   Connie M. Vike's claim that defendant Rock County violated the

Americans with Disabilities Act by failing to accommodate her disability;

        e.   Connie M. Vike's claim that defendant Rock County violated the

Americans with Disabilities Act by interfering with her ability to use employee

benefits because of her disability;

        f.  Connie M. Vike's claim that defendant Becker violated her right to equal

35

protection under the law; and

g. Connie M. Vike's claim that defendant Becker violated her right to due process.

2. Defendants' motion for summary judgment, dkt. #28, is DENIED with respect to:

a. Marvin C. Vike's claim that defendant Rock County failed to accommodate his disability; and

b. Marvin C. Vike's claim that defendants Coopman, Becker and Pierce violated his right to due process.

3. Plaintiff Connie M. Vike's claims against defendants are DISMISSED from the case with prejudice.

Entered this 10th day of July, 2009.

BY THE COURT:

BARBARA B. CRABB
District Judge

36